**UNITED STATES COURT OF APPEALS**

**FOR THE THIRD CIRCUIT**

```
EMERSON OBED HERNANDEZ        :
CULAJAY and M.S.H.S.,         :
a minor child,               :
                             :
              Appellants,     :
                             :
versus                        :      Case No. 19-2927
                             :
SECRETARY UNITED STATES       :
DEPARTMENT OF HOMELAND        :
SECURITY, FIELD OFFICE        :
DIRECTOR PHILADELPHIA UNITED  :
STATES IMMIGRATION AND CUSTOMS:
ENFORCEMENT, DIRECTOR UNITED  :
STATES IMMIGRATION AND CUSTOMS:
ENFORCEMENT and COMMISSIONER  :
UNITED STATES CUSTOMS &        :
BORDER PROTECTION,            :
                             :
              Appellees.      :
```

```
                    The Albert Branson Maris Courtroom
                    19th Floor
                    James A. Byrne United States Courthouse
                    601 Market Street
                    Philadelphia, Pennsylvania  19106

                    Tuesday, November 12, 2019
```

```
Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.
```

---

**TRANSCRIPTS PLUS, INC.**
**Transcribed by:  Karen Hartmann**
**435 Riverview Circle, New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
**CourtTranscripts@aol.com**

**BEFORE:**

THE HONORABLE THOMAS L. AMBRO

THE HONORABLE CHERYL ANN KRAUSE

THE HONORABLE STEPHANOS BIBAS

**COUNSEL FOR APPELLANT:**

Cambria & Kline, P.C.
By:  BRIDGET CAMBRIA, ESQ.
Bridget.cambria@cambriaklinelaw.com
484-926-2014
532 Walnut Street
Reading, Pennsylvania 19601

        AND

Pepper Hamilton LLP
By:  MICHAEL S. DePRINCE, ESQ.
deprincem@pepperlaw.com
202-220-1244
3000 Two Logan Square
18th and Arch Streets
Philadelphia, Pennsylvania 19103

        AND

Law Office of Amy Maldonado
By:  AMY MALDONADO, ESQ.
amy@amaldonadolaw.com
517-803-2870
Suite 610, 333 Albert Avenue
East Lansing, Michigan 48823

        AND

Pepper Hamilton LLP
By:  ANTHONY C. VALE, ESQ., ESQ.
valea@pepperlaw.com
215-981-4502
3000 Two Logan Square
18th and Arch Streets
Philadelphia, Pennsylvania 19103

        AND

**COUNSEL FOR APPELLANT:**
(Continued)

      University of Pennsylvania Law School
      By:  TOBIAS B. WOLFF, ESQ.
      twolff@law.upenn.edu
      215-898-7471
      Gittis Center for Legal Studies
      3501 Sansom Street
      Philadelphia, Pennsylvania 19104

**COUNSEL FOR APPELLEE:**

      Office of United States Attorney
      By:  VERONICA J. FINKELSTEIN, ESQ.
      veronica.finkelstein@usdoj.gov
      215-861-8598
      615 Chestnut Street
      Suite 1250
      Philadelphia, Pennsylvania 19106

         AND

      Office of United States Attorney
      By:  PAUL J. KOOB, ESQ.
      paul.koob@usdoj.gov
      215-665-8500
      615 Chestnut Street
      Suite 1250
      Philadelphia, Pennsylvania 19106

         AND

      United States Department of Justice Office
      of Immigration Litigation
      By:  ARCHITH RAMKUMAR, ESQ.
      archith.ramkumar@usdoj.gov
      202-598-8060
      P.O. Box 868 Ben Franklin Station
      Washington, DC 20044

         AND

      Office of United States Attorney
      By:  ANTHONY ST. JOSEPH, ESQ.
      anthony.stjoseph@usdoj.gov
      215-861-8267
      615 Chestnut Street
      Suite 1250
      Philadelphia, Pennsylvania 19106

**INDEX**

|                                         | PAGE |
|-----------------------------------------|------|
| Argument by Mr. Wolff                   | 5    |
| Argument by Mr. DePrince                | 16   |
| Argument by Mr. Ramkumar                | 29   |
| Rebuttal argument by Mr. DePrince       | 54   |
| Rebuttal argument by Mr. Wolff          | 56   |

1        **TUESDAY, NOVEMBER 12, 2019, 11:45 A.M.**

2              JUDGE AMBRO:  (Recording commences with the

3     following) ... case of today Hernandez -- I'm going to

4     probably mispronounce it -- Culajay -- Culajay versus

5     Secretary U.S. Department of Homeland Security, et al.

6              Messrs. Wolff, DePrince, and Ramkumar.  Am I even

7     coming close?

8              MR. RAMKUMAR:  That's right.

9              JUDGE BIBAS:  How does your client pronounce his

10    or her --

11             JUDGE AMBRO:  Yeah, C U L A J A Y, how do you

12    pronounce that?

13             MR. WOLFF:  Culajay, Your Honor.

14             JUDGE AMBRO:  Culajay.

15             JUDGE BIBAS:  Is it Hernandez Culajay --

16             MR. WOLFF:  Yes, Your Honor.

17             JUDGE BIBAS:  Or just Culajay?

18             MR. WOLFF:  Hernandez Culajay.

19             JUDGE AMBRO:  Culajay.  Thank you, very much.

20             MR. WOLFF:  May it please the Court, my name is

21    Tobias Wolff, and with my colleague, Michael DePrince, we

22    are here representing the Appellants.

23             I will be presenting the *Flores* issue; Mr.

24    DePrince will present the balance of the issues in this

25    case.  And we ask to reserve two minutes of rebuttal time

1    from Mr. DePrince's time.

2              JUDGE AMBRO:  That's fine.

3              MR. WOLFF:  The *Flores* Settlement Agreement is a

4    contract.  It binds the United States, its agencies and its

5    officers, and defines their duties and obligations in an

6    area of plenary and unique Federal concern.  The duties and

7    obligations of the United States in relation to the

8    detention, confinement and release of minors, in this case

9    a 6-year-old girl from Guatemala, when they arrived at the

10   Southern border of the United States are seized by Federal

11   agents, and are processed for purposes determinations about

12   detention and asylum.

13             JUDGE AMBRO:  Yeah, we -- we've got the facts.

14   I'm looking at the *Flores* Settlement, and I guess the focus

15   here has to be that consent decree 24(B).

16             MR. WOLFF:  Yes, Your Honor.

17             JUDGE AMBRO:  Normally you think of -- if you

18   have a problem with a consent decree, that you have to go

19   to the court that entered the consent decree.  But 24(B)

20   does have language, "Any minor may seek judicial review in

21   the United States District Court with jurisdiction and

22   venue," and then "In such an action, the United States

23   District Court shall be limited to entering an order solely

24   to effect the individual claims of the minor."

25             Can that consent decree grant subject matter

Culajay v. Secretary U.S. Department, et al.
Case No. 19-2927/November 12, 2019

1    jurisdiction?

2            MR. WOLFF:  Your Honor, let me answer that

3    question two ways:

4            First and foremost, the relevance of the

5    exposition that I gave just a moment ago is that this is an

6    agreement that is enforceable as a matter of Federal common

7    law; it has binding effect as a matter of Federal common

8    law.  That means that claims arising under that agreement

9    are claims that arise directly under Federal law.

10           And as the Supreme Court held in the *Illinois*

11   *versus City of Milwaukee* case, claims arising under Federal

12   common law are directly covered by Section 1331.

13           JUDGE AMBRO:  Yeah, I'm thinking of a case --

14   there's an old Second Circuit case, *Master Mates* from '82,

15   which said, you know, with a consent decree entered into in

16   Ohio, we don't have subject matter jurisdiction.

17           MR. WOLFF:  Yes, Your Honor.  So several distinct

18   issues come up in the enforcement of an agreement like the

19   *Flores* Agreement.

20           The first is the proposition that, as a general

21   matter, one District Court will not enforce directly the

22   injunction of another District Court.

23           JUDGE AMBRO:  Right.

24           MR. WOLFF:  That issue is not implicated in this

25   case.  The relief sought here is not a contempt citation

1    against the United States Government for a violation of an

2    order relating to the minor Plaintiff in this case.

3         Cases from the Supreme Court on down have

4    consistently said, including the *Flores* District Court in

5    the Ninth Circuit, that consent decrees are essentially

6    contracts.  They have some aspects of an order or an

7    injunction where they're incorporated into the order of a

8    court, but they're essentially contracts.

9         And the issue of an injunction to enforce an

10   injunction would only arise if a plaintiff sought to do

11   something, which is not at issue in this case, which is to

12   seek penalties for a violation of a specific order entered

13   by the issuing court.

14        Now there's a separate issue, and the issue is

15   insofar as a consent decree is a contract, are there forum

16   selection clause considerations about where that contract

17   can be enforced?  And, of course, the Supreme Court has

18   long-held that forum selection clauses and contracts are

19   enforceable, that's the *Carnival Cruise Lines versus Shute*

20   case.

21        And most consent decrees will either say by their

22   own terms that jurisdiction and enforcement is reserved to

23   this issuing court, which constitutes a forum selection

24   clause as to where that contract can be enforced.  Or they

25   will simply leave the matter unaddressed.

1                 JUDGE AMBRO:  I misspoke.  I think the case I

2     actually was thinking about was the *Stiller* (phonetic) case

3     out of the Second Circuit that dealt with Ohio, although

4     *Master Mates* also deals with the subject.

5                 But there, the Second Circuit held that a

6     judgment that was entered by the Northern District of Ohio

7     awarding damages for patent violations, and enjoining

8     further infringement could be registered in New York, but

9     the injunction -- you've got to go back to the Northern

10    District of Ohio, you can't come here in order to enforce

11    it.

12                MR. WOLFF:  Precisely so, Your Honor.  And if the

13    remedies sought were contempt for a violation of the Ohio

14    District Court's injunction, then the Ohio District Court

15    is the one that has to issue that remedy.

16                But if the remedies sought is simply a violation

17    of the contractual obligation on an ongoing basis that the

18    United States has undertaken to be bound by, that is a

19    remedy that can be sought in any court that has

20    jurisdiction over the settlement.

21                If I may, the Supreme Court's decision in the

22    *Kokkonen* case, which the Government relies upon very

23    heavily, that case doesn't say that settlement agreements

24    can only be enforced in the rendering court.

25                That case says that ordinarily, settlement

1    agreements are enforceable only as contracts, and the
2    special circumstance of the issuing court reserving
3    jurisdiction for itself on an ancillary basis to issue
4    orders --
5            JUDGE AMBRO:  Which is what didn't happen in
6    *Kokkonen*.
7            MR. WOLFF:  That's correct, which is why, in that
8    case, there was no independent basis for subject matter
9    jurisdiction over the claim under the contract and,
10   therefore, there was no basis for jurisdiction in Federal
11   Court.
12           Here, this is a contract which I believe the
13   Government concedes is enforceable as a matter of Federal
14   common law, and as a consequence, there's Federal question
15   jurisdiction.
16           JUDGE BIBAS:  So you haven't focused on the
17   relevant distinction from cases, like *Kokkonen* and patent
18   litigation where the Federal Government isn't a party to
19   it.  We had this question about whether it would get
20   enforced in State Court or Federal Court.  But the Federal
21   Government is a party to be, it'd be exceedingly unusual to
22   expect that this would be brought in State Court.
23           And then if it's going to be brought in Federal
24   Court, it's really just a matter of venue as to which
25   Federal District Court.

1          So that seems to be really an issue when we're

2     dealing with consent decrees that do not involve the U.S.

3     Government as a party, because this is a *Clearfield Trust*

4     kind of Federal contract with Federal common law.

5          MR. WOLFF:  I think that's exactly correct, Your

6     Honor; and if the Panel is of that view, I'm delighted.

7          And then the only question is what is the

8     appropriate venue in which to have this claim brought.  And

9     as we've explained in our brief, the suggestion by the

10    court below and the Government that this word

11    "jurisdiction" in Paragraph 24(B) refers to an independent

12    basis of subject matter jurisdiction, number one, that's

13    satisfied here;

14         Number two, a better reading is that it refers to

15    personal jurisdiction, which is not disputed in this case;

16         And the only question then is venue.  And under

17    28 U.S.C. Section 1391(e), venue lies in the Eastern

18    District because the plaintiffs are residing here, they are

19    subject to detention currently in the Berks facility.  That

20    means that a substantial amount of the events giving rise

21    to their claims, namely that the minor 6-year-old girl's

22    detention is violation of the Government's *Flores*

23    obligations, is happening as we speak in the Eastern

24    District of Pennsylvania.

25         JUDGE KRAUSE:  To be clear, you view those as two

1  distinct bases for subject matter jurisdiction:

2          That is the creation of a Federal right in this
3  agreement by virtue of the Government itself having
4  committed to certain provisions;

5          And separately, that this is a contract that is
6  governed by Federal common law.

7          Those are two -- you're arguing those are two
8  different alternative bases, both of which would provide
9  subject matter jurisdiction.

10          MR. WOLFF:  I believe the answer is yes; allow me
11  to clarify one point.  The original basis of subject matter
12  jurisdiction here is the Federal question statute.  And the
13  basis of that jurisdiction is these are claims that arise
14  under Federal common law because of the uniquely and
15  pervasively nature -- Federal in nature of this contract
16  which binds the United States Government, that is a direct
17  line from *Clearfield Trust*.

18          A second possible basis for independent subject
19  matter jurisdiction would be an extension of the principle
20  of ancillary jurisdiction.  That, frankly, is how most of
21  the Federal District Courts have addressed this question,
22  have viewed the matter.  And I actually think it's a much
23  more straightforward proposition to say that the Court need
24  not reach questions about how ancillary jurisdiction
25  operates in this setting.

1          There is original subject matter jurisdiction

2     under 1331.  These are Federal claims, and as Judge Bibas

3     made clear, the idea that the alternative here is to file

4     these claims in State Court is obviously rather foolish.

5          And the only question, therefore, is whether

6     there is venue in the Eastern District.  And under Section

7     1391(e), the answer is clearly yes.

8          JUDGE AMBRO:  Well, normally a consent decree is

9     a settlement that contains an injunction, and isn't that

10    what we have here?

11         MR. WOLFF:  I would say, Your Honor, let me

12    answer that in two ways:

13         First of all, sometimes a consent decree involves

14    an injunction, namely an executory order on an ongoing

15    basis that demands of a party that they take or are

16    refrained from taking certain actions.

17         JUDGE AMBRO:  Yeah.

18         MR. WOLFF:  That's not always the case.  In some

19    of the cases the Government has cited, for example, the

20    settlement is simply a damages award, and the court retains

21    jurisdiction to administer any disputes that might arise

22    under that settlement.  So I don't think that that's an

23    inevitable feature of these decrees.

24         But, once again, and I want to make sure to

25    address this point, Your Honor, it's informed a couple of

1   your questions.  Appellate courts and, indeed, the Supreme
2   Court, have consistently said that consent decrees are best
3   understood first and foremost as contracts.  That is the
4   fundamental principle of the *Kokkonen* decision.

5           There are circumstances where the Court that
6   issues and retains jurisdiction over the consent decree has
7   occasion to enforce it through the use of its injunctive
8   powers.  Where that is so, where a court issues an order,
9   and there's an argument that a party is in violation of an
10  ongoing order, the place to seek enforcement of that order
11  through contempt sanctions is the court that issued that
12  order.

13          JUDGE AMBRO:  But was there an injunctive element
14  of the consent decree entered in '97?

15          MR. WOLFF:  To be sure, Your Honor.  And the
16  injunctive element speaks to questions that have either
17  been addressed to the District Court in California as to
18  classwide relief, which that court reserved exclusively for
19  itself in the administration of this agreement.  As
20  distinct from the individual circumstances of newly
21  arriving minor migrants, like the 6-year-old plaintiff
22  here, which are obviously not the subject of any previous
23  applications for enforcement in the Central District of
24  California.

25          JUDGE AMBRO:  And, look, I empathize with your

1    position.  But my concern is that when I -- the only thing

2    I'm really finding that says, okay, we have subject matter

3    jurisdiction is a Northern District of Illinois District

4    Court case, but it looks like the Second Circuit in the

5    *Stiller* (phonetic) case, and maybe in *Master Mates*.  The

6    Eighth Circuit and the Eleventh Circuit seem to think that

7    when you have an injunctive element in a consent decree,

8    you've got to go back to the court that initially entered

9    the consent decree.

10            MR. WOLFF:  Your Honor, allow me to respond to

11   that in several ways:

12            First of all, most of the cases that talk about

13   ancillary jurisdiction as a basis for enforcing a consent

14   decree are not talking about excluding other jurisdictions

15   from the possibility of entertaining an enforcement action.

16   They're talking about whether there is an independent basis

17   for jurisdiction to enforce the agreement in the first

18   place.  These are cases where the parties have either not

19   argued, or the court has found that there's no other

20   independent basis for subject matter jurisdiction.  That's

21   quite different from the case here where this is squarely a

22   Federal question case enforcing a contract which is

23   enforceable as Federal common law.

24            The only question that arises -- and I think this

25   flows directly from the Supreme Court's decision in

1    *Kokkonen*.  The only question that arises when there is a

2    separate and independent basis for subject matter

3    jurisdiction, as is true here, is is there anything about

4    the relief sought that indicates that it's not appropriate

5    for another District Court to administer that relief as a

6    contract enforcement action, rather than having to go back

7    to the original issuing court and seek an enforcement of an

8    ongoing executory injunction.

9         And in this case, what the issuing court did with

10   *Flores* is to draw a very clear distinction between

11   classwide relief and, which is enforced on an injunctive

12   basis from the issuing court, and the circumstances of

13   individual class members, which are the subject of

14   contractual obligations that the United States has

15   undertaken, and that's what's at issue in this case.

16        JUDGE AMBRO:  All right.  Thank you very much.

17        MR. WOLFF:  Thank you, Your Honor.

18        JUDGE AMBRO:  Mr. DePrince.

19        MR. DePRINCE:  Good afternoon, Your Honors.  And

20   may it please the Court, Michael DePrince for Appellants.

21   As stated by my colleague, Mr. Wolff, I will be addressing

22   the balance of the issues presented in this appeal.

23        And first, I would like to begin with the claim

24   regarding the statutory authorization to subject these

25   individuals to MPP.

1          JUDGE AMBRO:  So your fourth -- this is your

2     third claim.

3          MR. DePRINCE:  Third claim.

4          JUDGE AMBRO:  Yes.

5          MR. DePRINCE:  Correct, Your Honor.

6          JUDGE AMBRO:  Yes.

7          MR. DePRINCE:  Thank you.

8          And first I'd like to address jurisdiction.  The

9     District Court believed that Appellants attacked ICE's

10    decision to place them in standard removal proceedings, and

11    that this was necessarily an action taken to remove an

12    alien under Section 1252(b)(9).

13         Our position is that forced relocation to Mexico

14    under MPP is a custody determination, and that this

15    presents questions of law which do not arise from removal

16    proceedings for purposes of 1252(b)(9).  Appellants do not

17    challenge any part of the process by which their

18    removability will be determined and they, instead, claim

19    that the Government lacks statutory authority under 1225 to

20    forcibly relocate them to Mexico until their removability

21    is ultimately determined.  And because custody

22    determinations are not within the providence of immigration

23    courts, this claim is precisely collateral and should have

24    been heard.

25         JUDGE KRAUSE:  But *Jennings* takes the position --

1   in *Jennings*, the court suggested that a challenge to any

2   part of the process by which removability will be

3   determined will fall within (b)(9).  And I understand

4   you're trying to draw a distinction between the return and

5   removal, but why isn't the return part and parcel of the

6   removal process?

7   MR. DePRINCE:  Your Honor, even if it were part

8   and parcel of the removal process, *Jennings* instructs that

9   the guiding analysis is whether questions of law arise from

10  an action taken to remove an alien.  And these questions of

11  law relate to the statutory authorization to remove them to

12  Mexico during the pendency of their removal proceedings.

13  And *Jennings* also makes clear that challenges to

14  detention determinations, such as in *Jennings,* a prolonged

15  detention, do not arise from removal proceedings.

16  JUDGE BIBAS:  So is that your answer?  I'm sorry;

17  please finish.  You were going to --

18  JUDGE KRAUSE:  You may be asking the same

19  question.  Are you then trained to an argument that it

20  would be rendered unreviewable?  Is that your point?

21  MR. DePRINCE:  That would be the point.  At the

22  moment that they are returned to Mexico, there will be a

23  harm that is incurred, and there is nothing that can be

24  addressed through the PFR process that could ameliorate

25  that harm that is incurred at the moment of being returned

1    forcibly to Mexico during their --

2              JUDGE BIBAS:  I'd like to connect that up to the

3    fourth point, which is the Convention Against Torture

4    point.  You've mentioned withholding against removal below,

5    the APA is thrown in there, what's the gist of the harm?

6    The Government's response is, well, it can't be withholding

7    removal because this is not about removal.

8              But is this -- is that claim fundamentally about

9    the risk of harm in Mexico versus the risk of harm in

10   Guatemala?  Because that seems central to whether under

11   *Jennings* this, in fact, is going to escape review later or

12   not.

13             MR. DePRINCE:  Your Honor, I think there is risk

14   of harm in Guatemala, but the risk of -- in Guatemala, as

15   well as Mexico.  But the issue, as the Government concedes,

16   is that the Government's non-refoulement obligations is

17   nondiscretionary, and the act of moving someone out of the

18   country, whether characterized as a return to Mexico

19   forcibly --

20             JUDGE BIBAS:  Right.

21             MR. DePRINCE:  -- or a removal to Guatemala,

22   altogether is a refoulement decision by removing them out

23   of the boundaries of the United States.

24             JUDGE BIBAS:  So maybe "remove" is the wrong

25   word.  Extrude; other words get used for the treaty.  But

1    the point is, by putting the person back in Mexico, you're

2    saying it's a violation of CAT, but it's also then not a

3    CAT issue that would then be reviewable through the removal

4    process because this is -- it's a now or never kind of

5    review under IV; your fourth claim piggybacks on Mexico

6    then.

7              MR. DePRINCE:  That would be correct, Your Honor.

8              JUDGE BIBAS:  Okay.

9              MR. DePRINCE:  But -- and as you state, it would

10   be effectively unreviewable.  Once they are placed in

11   Mexico, they would not be able to bring any claims in a PFR

12   process until eventually a final order of removal to

13   Guatemala issued by the BIA, and at that point the harm is

14   already incurred.

15             And that is the problem of reading 1252(a)(4) the

16   way the District Court did is that it leaves them without a

17   forum to bring their claims of harm.  And it also does not

18   align with the purposes of the CAT statute itself, which is

19   not to return people to any place in which they face a risk

20   of harm, not just a removal to a home country or a place.

21             JUDGE BIBAS:  So let's talk.  You resist the

22   Ninth Circuit's approach in *J.E.F.M.* when we're talking

23   about what the meaning of (b)(9) is here, and you say the

24   Circuit decision in 2016 is superceded by *Jennings* in

25   Justice Alito's plurality opinion in 2018, correct?

1          MR. DePRINCE:  Yes, Your Honor.

2          JUDGE BIBAS:  And so the analysis you want us to

3   apply is whether this is challenging part of the process by

4   which removability would be determined.  And then we've got

5   a question about what arising out of means, and it doesn't

6   mean the very expansive one, but is it part and parcel of a

7   process.

8          MR. DePRINCE:  Right.  And I think that *J.E.F.M.*

9   equally mandates that claims that are independent or

10  collateral to the process, even notwithstanding --

11         JUDGE BIBAS:  So your reply takes the position

12  we've got to ask is it independent, is it collateral, it's

13  not clear to me that it's either or whether it's both, but

14  that's a train we have to ask on.

15         So I'm wondering why that doesn't at least limit

16  the scope of your second point, which is the right to

17  counsel point, right?  You have a statutory right, but that

18  statutory right, I believe, is geared towards your ability

19  to litigate your removal.  But that's reviewed all the time

20  when we review a decision granting withholding, denial of

21  removal, or CAT relief.

22         Your constitutional claim, I can't tell whether

23  that's just about the removal decision at the end, or

24  whether there's also a distinct component of it that's

25  about the being put back in Mexico temporarily.

Culajay v. Secretary U.S. Department, et al.
Case No. 19-2927/November 12, 2019

1       Can you explain to me, or unpack, are there two

2  constitutional claims here?  Is the constitutional claim

3  about what's happening now to Mexico or does it bear on

4  your eventual return to Guatemala?

5       MR. DePRINCE:  So I think first, Your Honor, it

6  does not bear on the eventual return to Guatemala.  By

7  being placed in Mexico, there is effective termination of a

8  right to counsel, and there is no more avenue for those

9  individuals to be represented by counsel who are here in

10  Reading right down the street from where they are currently

11  detained in Berks.

12       At the moment that they are separated from

13  counsel, there will be nothing that an appellate court --

14  whether that an appellate court or a court of appeals on a

15  PFR -- could do to reverse that harm that was incurred at

16  the moment of separation.

17       JUDGE BIBAS:  But if *Jennings* is the test, and

18  you suggest that *Jennings* might supersede, you know, or

19  adjust how we reach *Chehazeh* and some other precedent,

20  isn't it -- is it part of the process by which the

21  removability will be determined?  Why is this something

22  that if they're denied counsel now, it may be unlawful, but

23  it routinely gets reviewed in the petition for a review,

24  why is this different from your run-of-the-mill?  What

25  makes it independent of, or collateral to, in the way that

Culajay v. Secretary U.S. Department, et al.
Case No. 19-2927/November 12, 2019

1    you agreed in your reply brief was the right test?

2           MR. DePRINCE:  The types of right to counsel

3    claims that are often brought on a PFR claim involve some

4    kind of ineffective assistance of counsel or something that

5    an IJ did incorrectly, such as denying a continuance to

6    seek counsel, forcing an individual to proceed without

7    counsel, or ineffectively finding a waiver of a right to

8    counsel.

9           That is not what this is.  This is a DHS decision

10   to place someone outside the boundaries of the United

11   States, and that, in and of itself, creates an independent

12   harm.  We would be disingenuous to say that it wouldn't

13   have an effect overall on the outcome of the removal

14   proceedings, but that is not the singular claim.

15          The claim is that they will face an independent

16   harm to their attorney-client relationship at the moment of

17   forced relocation to Mexico, and we do not --

18          JUDGE AMBRO:  Is your primary basis a statutory

19   right to counsel or a constitutional right to counsel?

20          JUDGE KRAUSE:  Or both?

21          JUDGE AMBRO:  Or both?

22          MR. DePRINCE:  It would be both, Your Honors.

23          And the source of the right is located as to

24   removal proceedings, as the Government says.

25          However, *Chehazeh*, which correctly states that,

Culajay v. Secretary U.S. Department, et al.
Case No. 19-2927/November 12, 2019

1    it's the nature of the claim that determines whether a

2    claim arises from an action taken or proceeding brought to

3    remove an alien.  And that is what's at issue here, that

4    the legal issues do not arise from the removal process

5    itself.  The issues arise from a custody determination that

6    effectively terminates an attorney-client relationship, and

7    that is its own independent harm.

8         JUDGE AMBRO:  *Chehazeh* says that 1259(b)(9) only

9    applies to final orders of removal.  Does *Jennings* -- how

10   does *Jennings* affect that?

11        MR. DePRINCE:  Your Honors, *Jennings* takes a

12   slightly different analytical path in stating that whether

13   the question of law arises from an action taken or a

14   proceeding brought to remove an alien.  And the plurality

15   there states this is not an action arising from.  This

16   custody determination does not arise from removal

17   proceedings.  In that sense, this -- the factual predicate

18   is very apposite.  Here, the --

19        JUDGE AMBRO:  In effect, it's related to in some

20   way, is it not?

21        MR. DePRINCE:  It is.  And the dissenting

22   justices in *Jennings* said what the *Chehazeh* case would say

23   in that, we don't have a final order of removal here.  But

24   the *Jennings* plurality is equally instructive in that this

25   custody determination does not invoke questions of law that

1   arise from a removal proceeding as intended by 1252(b)(9).

2          JUDGE AMBRO:  Okay.  Any further questions?

3          JUDGE KRAUSE:  Yes.  We have been asked by the

4   Government to affirm on the merits as to the statutory

5   authorization claim.  And you're arguing that they were

6   found inadmissible -- because they were found inadmissible

7   under 1182(a)(7), (b)(1) still applies even though they've

8   been placed in standard removal.

9          MR. DePRINCE:  That is correct, Your Honor.

10          JUDGE KRAUSE:  How can it still apply if they are

11  going down -- they've been put into a different category

12  with different treatment?

13          MR. DePRINCE:  Yes, if I could cite the *Matter of*

14  *M.S.* decision issued by the Attorney General, I think that

15  speaks to that very well.

16          The Attorney General recognized that both (b)(1)

17  and (b)(2) applicants may be placed in regular removal

18  proceedings, although by different mechanisms.  The way a

19  (b)(1) applicant arrives at that can be one of two ways:

20          First, they are presenting at the United States

21  border and they do not have the documents necessary to

22  enter the United States.  They are outright inadmissible on

23  that basis, and they would normally be subjected to

24  expedited removal.

25          However, (b)(1) adds in an extra layer of

1    protection for those individuals who an Immigration officer

2    can determine at that moment does not possess the requisite

3    documents to enter the country; that is going through a

4    credible fear process.  And if they go through a credible

5    fear process, and there is a positive determination at the

6    end of that, they are entitled to remain in the U.S.

7    pending their removal proceedings.

8            And alternatively, as *M.S.* recognizes, DHS

9    maintains overarching discretion to place a (b)(1)

10   applicant into standard removal proceedings, citing not

11   Section (b)(2), but instead Section (b)(1) and a BIA

12   decision, *E.R.M.*, which states that DHS has discretion to

13   place (b)(1) applicants into standard removal proceedings.

14           The alternative is if you are a (b)(2)

15   individual, you present at the border, and there is some

16   doubt, you are potentially inadmissible but an Immigration

17   officer is not sure, that's when there are removal

18   proceedings instituted to determine whether or not that

19   person is, in fact, admissible -- is clearly, and without

20   doubt, admissible into the United States.  If that is

21   found, the inquiry ends, and the person enters the United

22   States.

23           But (b)(1) sets up certain protections aligned

24   with the United States' nondiscretionary non-refoulement

25   obligations to ensure that those individuals who arrive at

1    a border and an Immigration officer determines have no

2    documents, and are clearly inadmissible into the United

3    States, then have some kind of recourse of not being

4    summarily sent out of the country, but instead may go

5    through some kind of asylum or CAT claim in order to avail

6    themselves to the protections of the United States, and not

7    be returned from harm outside of our boundaries.

8         JUDGE KRAUSE:  Going back to the right to counsel

9    claim and bifurcating the extent to which it relates to the

10   return to Mexico versus removal overall, I understand your

11   argument to be that this is a total deprivation, and that

12   would state a claim in violation both of the statute and

13   Constitution as to removal.

14        But even a total deprivation claim, why couldn't

15   that be raised in the course of removal proceedings?

16        MR. DePRINCE:  It could be raised during removal

17   proceedings, but there is nothing that a court of appeals

18   eventually on PFR could do, or that the BIA could do, or

19   that the IJ could do because it is a custody determination

20   that is outside the providence of an immigration court.

21   And by the time that it reached a court of appeals on PFR,

22   it strikes me that there is nothing that a Circuit Court of

23   Appeals could do to reverse that harm that occurred

24   months/years prior.  We would just need an altogether redo

25   of their removal proceedings, which would thwart judicial

1   economy.

2          And another way to answer your question, Judge,

3   is that there are other types of advice that are tied into

4   an attorney-client relationship that do not bear on

5   removal.  For example, we have a minor 6-year-old child

6   here.  Counsel could determine that that child is eligible

7   for SIJS status, and that is an application that is not

8   filed in an immigration court.

9          And if counsel cannot have a sensitive -- or an

10  in-person conversation regarding very sensitive traumatic

11  past occurrences that a 6-year-old child incurred, there is

12  no way of helping that child outside the confines of a

13  removal process.

14         So it's more than just the ability to be

15  represented at the removal proceeding, it's the ability to

16  be represented altogether at that point.

17         JUDGE KRAUSE:  One other question on the CAT

18  claim.  So (a)(4) in its jurisdiction-stripping has,

19  "except as provided in Subsection (e)."

20         MR. DePRINCE:  Yes, Your Honor.

21         JUDGE KRAUSE:  And Subsection (e) seems to carve

22  out the opportunity to seek relief for things like certain

23  programs in the District of Columbia.  Does your claim fall

24  into that category?  That is perhaps it is a carve-out, and

25  is an exception, but there's a different place that you're

1    required to go.

2              MR. DePRINCE:  I think that section, Your Honor,

3    does not bear on this case.  We're not asking for

4    affirmative relief that is available through discretion,

5    for example.  We're asking for a violation of our non-

6    refoulement obligations not to occur during an individual's

7    removal proceedings, and that's detached from a

8    discretionary relief determination.  That's just something

9    that we think should be part and parcel of the non-

10   refoulement obligations that you do not leave the United

11   States by force absent some minimally sufficient rights and

12   procedures to protect against an erroneous removal or

13   return outside the United States.

14             JUDGE AMBRO:  Okay; thank you very much.

15             MR. DePRINCE:  Thank you, Your Honors.

16             JUDGE AMBRO:  Mr. Ramkumar?

17             MR. RAMKUMAR:  May it please the Court, Archith

18   Ramkumar for the Appellees.

19             This Court should affirm the decision below

20   because the District Court correctly concluded that it

21   lacked subject matter jurisdiction over Appellants' *Flores*

22   Settlement Agreement claim, Appellants' right to counsel

23   claim, Appellants' non-refoulement claim, and because the

24   Migrant Protection Protocols are statutorily authorized.

25             JUDGE AMBRO:  Why isn't this just, at least as to

1    the Migrant Protection Protocols, simply a challenge to a

2    custody decision as opposed to removal?

3          MR. RAMKUMAR:  Well, in terms of the

4    jurisdictional issues presented, Your Honor, the

5    Government's position would be, just taking all of the

6    claims in turn, that first with respect to the

7    *Flores* Agreement, subject matter jurisdiction cannot be

8    created by consent.

9          With respect to the right to counsel claim,

10   Appellants' claim is not that their right to counsel during

11   the course --

12         JUDGE AMBRO:  Yeah, but I'm just -- I'm talking

13   about the challenge to the program.  It seems like they're

14   talking more about custody, are they not?

15         MR. RAMKUMAR:  So --

16         JUDGE AMBRO:  How you're treated during this

17   process, where you're housed, you know, sending you to

18   Mexico.  That seems to be significantly removed from, okay,

19   we're going to determine whether you belong in the United

20   States via an asylum or a CAT claim, this is the process by

21   which you're treated in the interim.

22         MR. RAMKUMAR:  So if I'm understanding your

23   question correctly, the Government's understanding is that

24   the custody claim is a component of the *Flores* Settlement

25   Agreement claim, but not the remaining claims being

1   asserted in this case.

2               Turning first to the *Flores* Settlement

3   Agreement --

4               JUDGE KRAUSE:  I'm sorry, I'm not trying to -- I

5   understand --

6               JUDGE AMBRO:  I'm thinking of it as a

7   classification issue maybe.

8               JUDGE KRAUSE:  There may be a claim, both under

9   the *Flores* Agreement, but there's also the claims about

10  statutory authorization, for example.  I mean this goes to

11  (b)(9), right?

12              JUDGE AMBRO:  Right, yeah.

13              JUDGE KRAUSE:  And why isn't this analogous to

14  *Jennings* in terms of detention?  It's conditions in which

15  these non-citizens are kept, and it is essentially

16  unreviewable.  How do you distinguish this situation from

17  *Jennings*?

18              MR. RAMKUMAR:  Is your question specific to the

19  statutory claim or all of the claims?

20              JUDGE KRAUSE:  Well, it's really to the first

21  three, and specifically (b)(9) as applied to their second

22  and third.

23              MR. RAMKUMAR:  Right.  So the way I want to

24  answer that question to essentially briefly go through the

25  Government's understanding of what the claims are in this

1    case.

2         So as pled below and asserted below at the

3    preliminary injunction stage -- and the Court can observe

4    this at Pages 319 to 320 of the joint appendix -- the right

5    to counsel claim was specifically the burden on the counsel

6    relationship in the removal proceeding.  And on the record,

7    the District Court explicitly said that this right has

8    nothing to do with MPP but, in fact, was a burden on the

9    relationship subsequently during the course of the appeal

10   to the BIA.

11        And with respect to the classification decision,

12   the Government's understanding is that this claim had two

13   components.  So below -- and the Court can see this

14   primarily at Page 346 of the joint appendix -- that

15   Appellants asserted that they were erroneously placed in

16   full, rather than expedited, removal proceedings.  They

17   appear to have disavowed that component of the claim on

18   appeal, but appear to, nonetheless, state that the

19   statutory authorization is lacking for MPP.

20        Now with respect to that latter component, the

21   Government does not believe that that necessarily goes to a

22   custody determination, but that (b)(9) strips the court of

23   jurisdiction over the first component of the claim.  And

24   the reason is as the District Court found, that's a

25   discrete action taken in conjunction with the removal

1    proceedings.

2         JUDGE BIBAS:  So your position is not that you

3    couldn't have a right to counsel claim that was independent

4    of the sort that was being discussed here advising the 6-

5    year-old on SIJS status, etc., but that you just don't

6    think that was pled here.

7         MR. RAMKUMAR:  I think that's right, Your Honor.

8    I think the right to counsel claim here was explicitly

9    framed as being intertwined with the removal proceeding.

10   If there were a different right to counsel claim limited,

11   for example, to the non-refoulement interview, and it was

12   made clear that there were no subsequent effects on the

13   removal proceedings, that would be a very different claim,

14   but that was not the claim raised here.

15        JUDGE BIBAS:  Well, I think you're -- I think

16   that you run into a problem because the fourth claim, when

17   you drill down to it, really looks like -- I mean call it

18   custody, detention, extrusion to Tijuana, but whatever it

19   is, the fourth claim, the APA CAT claim is about the harm

20   they're going to suffer in the interim, just as in

21   *Jennings*.

22        So your logic might or might not work for the

23   right to counsel one, but it cuts against you on the CAT

24   one, on the harm they would suffer in Mexico in the

25   interim.  It's now or never for review on that one.

1          MR. RAMKUMAR:  So with respect to the CAT claim,

2   Your Honor, the Government's arguments are different, and

3   the District Court's analysis on that point was different

4   than (b)(9).  The District Court concluded that 1252(a)(4)

5   stripped it of jurisdiction, and the Government noted that

6   1252(a)(4) strips this Court of jurisdiction in conjunction

7   with other jurisdiction-stripping provisions.

8          And I want to focus acutely on Section

9   1252(a)(4), which is unequivocal in stating that claims

10  that the CAT was violated must be brought in conjunction

11  with a PFR.  And further support for this is seen in the

12  Foreign Affairs Reform and Restructuring Act, specifically

13  Section 2242.

14         Now Appellants specifically invoke FARRA on Page

15  39 of their opening brief and Section 2242(a) as stating

16  that this is where the protections against the Convention

17  Against Torture are enshrined.

18         But Section 2242(d) of FARRA states specifically

19  that no part of FARRA shall be understood as conferring

20  upon any court judicial review to review any claims except

21  in accordance with Section 1252.

22         So the Government would submit that those two

23  provisions in tandem make it clear that the CAT claim has

24  to be raised in conjunction with the PFR process in

25  Section --

Culajay v. Secretary U.S. Department, et al.
Case No. 19-2927/November 12, 2019

1          JUDGE BIBAS:  Could there be a PFR for this?

2    This is not a -- this is not a permanent removal, it's a

3    temporary placement back in Mexico.  So how could they file

4    a PFR here?

5          MR. RAMKUMAR:  So, again, Your Honor, I want to

6    just focus in response to your question, specifically on

7    the claim being pled here, and below, and on Pages 401 to

8    402 of the joint appendix.

9          So primarily below, the non-refoulement claim was

10   that it was arbitrary and capricious for the Government to

11   require individuals to affirmatively state a fear in order

12   to receive a fear assessment interview.  Now that part of

13   the claim is completely moot, and Appellants do not suggest

14   otherwise.

15         So the only part of their claim that remained is

16   that the return to Mexico violates the Convention Against

17   Torture.  And the Government would submit that the text of

18   Section 1252(a)(4) in conjunction with FARRA evinces a

19   congressional intent not to make return decisions

20   judicially reviewable.  And for further support, the

21   Government would rely on the rule of non-inquiry and the

22   extradition context --

23         JUDGE BIBAS:  What about the APA angle here?

24   That it's not the CAT on its own, it's that the Government

25   is violating the APA.

1          MR. RAMKUMAR:  So the response to that, Your

2     Honor, would be Section 1252(a)(2)(B)(ii) which strips

3     courts of jurisdiction over discretionary determinations.

4     There is no dispute that return determinations are

5     discretionary, and the Government cited in its brief cases

6     applying the logic of Section 1252(a)(2)(B)(ii) not to the

7     ultimate discretionary determinations themselves, but also

8     to the procedures being utilized to arrive at those

9     determinations.

10          Now in this case, there is no allegation that the

11     non-refoulement procedures prescribed by the Migrant

12     Protection Protocols were not utilized; they were followed.

13     And Appellants' suggestion or assertion is that they were

14     simply insufficient.

15          But under Section 1252(a)(2)(B)(ii), this Court

16     lacks jurisdiction to review those procedures, and the same

17     would be true of the rule of non-inquiry.

18          Just briefly on that last point, the reason

19     applicability of the rule of non-inquiry is appropriate

20     here is because returning back to FARRA, FARRA places both

21     temporary return and extradition on equal footing in

22     Section 2242(a).  And then Section 2242(d) makes clear that

23     the decisions are not judicially reviewable except in

24     conjunction with a PFR, and that would be an additional

25     reason to apply the rule of non-inquiry here.

1      JUDGE KRAUSE:  But isn't their point as to both?

2  It's not discretionary, the claim -- without getting into

3  the merits, but the claim is that this return is in

4  violation of treaty obligations.

5      MR. RAMKUMAR:  So, Your Honor, I would agree that

6  is one component of the claim.  I was answering Judge

7  Bibas' question with regard to the APA, and specifically

8  with respect to the procedure.

9      So with respect to the ultimate results of the

10  return decision itself, the Government would, again, return

11  to Section 1252(a)(4), and specifically the fact that the

12  plain text of that provision bars judicial review of claims

13  precisely like the claim that was pled below.

14      JUDGE BIBAS:  So if the Culajays are contesting

15  the procedures relating to their return to Mexico, how can

16  we ensure those claims are reviewed?

17      MR. RAMKUMAR:  So --

18      JUDGE BIBAS:  Timely.

19      MR. RAMKUMAR:  -- in this particular case, the

20  claims that were raised or pled were very narrow.  There

21  was no habeas claim, and the only due process claim was

22  raised in connection with the right to counsel.  Without

23  seeing the full universe of possible claims, there may be

24  other claims or other extreme circumstances where a review

25  may be warranted.  This Court's precedent has noted, for

1   example, that the rule of non-inquiry is not appropriate in
2   extreme cases.

3          But the Government would submit that this is not
4   an extreme case because the non-refoulement process has
5   prescribed procedures, and those procedures were followed
6   here, namely an interview with an interpreter, a written
7   transcription, and supervisory asylum review.

8          And so under both the rule of non-inquiry and
9   Section 1252(a)(2)(B)(ii), the procedure would not be
10  reviewable.

11          JUDGE AMBRO:  The rule of non-inquiry being what?

12          MR. RAMKUMAR:  The rule of non-inquiry, Your
13  Honor, essentially states that if there are procedures in
14  place, and they are followed in conjunction with a
15  discretionary determination then the court's review shall
16  have reached its end.  And the Government would cite
17  primarily to the *Trinidad* case out of the Ninth Circuit
18  which makes that exact point, albeit in the extradition
19  context, but for the reasons I've already stated, the
20  extradition context is an appropriate analogue here.

21          JUDGE KRAUSE:  And isn't it the case that that's
22  never been exploited outside of the extradition context?

23          MR. RAMKUMAR:  So the Government would submit
24  that in the *Munaf versus Geren* Supreme Court case, though
25  the rule of non-inquiry is not explicitly mentioned by

1   name, the principles underlying the doctrine were arguably

2   applied in that case in a habeas petition where the

3   petitioner, again, claimed that transfer to Iraqi custody

4   would result in his torture.

5          I briefly want to return back, if I may, to the

6   right to counsel claim, and specifically this Court's

7   decision in *Chehazeh*.  It's important to note, I think, at

8   the outset that both parties agree that the appropriate

9   framework for assessing that claim is whether or not the

10  claim is ancillary or collateral to removal proceedings.

11         And as the Government noted in its brief,

12  extending *Chehazeh* to this claim and this case would not

13  only create a circuit split, but there are additionally

14  four reasons why it should not be applied here:

15         First and foremost were the unusual circumstances

16  of that case, that's 666 F.3d at 121.  And this Court

17  specifically emphasized that and the fact that the claim

18  could not be efficaciously raised in the course of

19  administrative proceedings.

20         Now that is not the case with respect to the

21  right to counsel claim as it was pled below, namely that

22  the transfer to Mexico would burden the right to counsel

23  and detrimentally impact the fairness --

24         JUDGE AMBRO:  But the holding of *Chehazeh* is

25  pretty broad, is it not?

1          MR. RAMKUMAR:  It is, Your Honor.  And that gets

2     to my second through fourth reasons:

3          The second reason is that in *Chehazeh*, this Court

4     relied extensively on the Ninth Circuit's decision in *Singh*

5     *v. Gonzales*.  But subsequently, the Ninth Circuit issued

6     *J.E.F.M.* and cabined *Singh* to the unique facts of that case

7     because *Singh*, like *Chehazeh*, involved a unique situation

8     where the claim could not be efficaciously raised.  But,

9     again, that is not the case with the right to counsel claim

10    considered in *Aguilar*, and *J.E.F.M.*, and here.

11         Third, as a practical matter, and the Government

12    noted this in its brief, if a final order of removal were

13    required in order for Section 1252(b)(9) to apply in the

14    first instance, then the provision would essentially be

15    rendered a dead letter.  And the reason for that is claims

16    that arise from removal proceedings, which is the statutory

17    language, necessarily only accrue prior to the entry of a

18    final order of removal.

19         So if *Chehazeh*'s holding were extended, then at

20    that point, all Section 1252(b)(9) would reach would be the

21    final order of removal itself.

22         At that point, however, the provision would be

23    entirely duplicative of Section 1252(a)(5).

24         And finally -- the Government noted this point

25    briefly on Page 37 of its brief -- extending *Chehazeh*

outside of the unique circumstances of that case would
essentially resurrect the very state of affairs Congress
sought to eliminate when it enacted Section 1252(b)(9),
namely piecemeal or fragmented litigation over claims that
are clearly tied to the removal process.

But the core takeaway with respect to the right
to counsel claim is that Appellants explicitly admitted
below under questioning by the District Court that the harm
would be to the fairness of their removal proceedings, not
to the MPP proceeding itself, and that concession is --

JUDGE KRAUSE:  Where did they say that they were
not making any claim as to right to counsel as applied to
these other claims that they're raising?

MR. RAMKUMAR:  So I would return back to the
citation I gave you, along with the framing of the issue
both below and on appeal, Your Honor.  The framing on the
issue on appeal has been that the right to counsel
relationship will be burdened if the clients are
transferred to Mexico and, in turn, the fairness of the
proceedings before the BIA will be detrimentally impacted.
And that claim is inextricably intertwined with removal
proceedings.

And I finally want to return, if I may, back to
the statutory claim.

JUDGE KRAUSE:  I'm sorry.  What about the

1    argument that they've made -- and I'm sorry, can you tell

2    us where in the appendix you say that below they limited

3    their right to counsel claim only to the harm to the

4    removal proceedings itself?

5              MR. RAMKUMAR:  So I would rely primarily on

6    Pages 319 to 320, and specifically on Page 320 there is a

7    colloquy where the District Court asked, "What the harm is

8    to the counsel relationship?"

9              And the response is, "The harm is the fairness to

10   the removal proceedings."

11             And then on Page 319, the District Court said,

12   "So this doesn't have anything to do with MPP."

13             JUDGE KRAUSE:  And they argued a few minutes ago

14   that it's really a claim of the complete and total

15   deprivation of counsel, something that would be effectively

16   unreviewable by the time it got to a PFR, and what's your

17   response to that?

18             MR. RAMKUMAR:  So my response, Your Honor, and it

19   piggybacks on several points I've made, is that if the

20   underlying claim, which it is in this case, is that the

21   fairness of removal proceedings will be detrimentally

22   impacted based on the burden on the counsel relationship,

23   that claim can be raised in a PFR.  Specifically they are

24   free to argue to the Court of Appeals that the removal

25   proceeding itself was rendered unfair by the burden on the

1    counsel relationship.

2         There is no bar on efficaciously raising that

3    claim, unlike the claims at issue in *Chehazeh* or even

4    *Jennings*, for example.

5         I see that I'm out of time, but I --

6         JUDGE AMBRO:  That's fine.  Why don't you -- if

7    you can go into the *Flores* Settlement issue.

8         MR. RAMKUMAR:  Certainly, Your Honor.  So

9    returning back to the beginning of my argument, so the

10   principle underlying *Kokkonen* and the lower court decisions

11   applying *Kokkonen* that the Government relies on is that

12   subject matter jurisdiction cannot be created by consent,

13   and the District Court recognized this very point on

14   Pages 7 to 8 of the joint appendix.  And, indeed, one court

15   in the Southern District of California has relied on this

16   very reasoning to find that it lacks jurisdiction over

17   *Flores* Settlement Agreement claims that are identical to

18   the claims being asserted here.

19        JUDGE BIBAS:  But you admit the U.S. Government's

20   being a party makes it different, and the U.S. Government's

21   being a party means Federal common law applies to these

22   agreements, and that's a basis for Federal jurisdiction,

23   isn't it?

24        MR. RAMKUMAR:  So two responses on that point,

25   Your Honor:

1          So first, we would not agree that it makes it

2     different, and we would cite to a number of cases in our

3     brief where the United States, or one of its agencies, were

4     parties to a consent decree, yet nonetheless courts found

5     that they lacked Federal subject matter jurisdiction,

6     again, for the reasons articulated in *Kokkonen*.

7          JUDGE BIBAS:  Which case found not that they had

8     jurisdiction in venue A, but that they lacked jurisdiction

9     in venue B?

10          MR. RAMKUMAR:  So the Government believes that

11     *Munoz versus Mabus* out of the Ninth Circuit stands for that

12     proposition, and the *Slaughter* case out of the Eleventh

13     Circuit, I think, is a really good illustration.  So that

14     case concerned a consent decree entered in the District

15     Court for the District of Columbia, and a claim was brought

16     to enforce that in the Middle District of Georgia.  And the

17     Eleventh Circuit said that subject matter jurisdiction was

18     lacking, in large measure because of the principles

19     elucidated in *Kokkonen*.

20          JUDGE BIBAS:  Why isn't that really a venue

21     question, as your friend on the other side says?

22          MR. RAMKUMAR:  And I would come back to the fact

23     that it's not a venue question because subject matter

24     jurisdiction cannot be created by consent even when the

25     United States, or its agencies, is a party.

1      And I would also submit that this question of

2    Federal common law, the *Flores* Settlement Agreement was not

3    created by Federal common law.  Judge Gee put the point

4    succinctly in her most recent opinion on September 27th,

5    that "it is a creature of the parties' contractual

6    agreements."

7      JUDGE BIBAS:  But your friend on the other side

8    makes the point that the wording of 1331 is the District

9    Courts shall have jurisdiction.  They're understood as a

10   collective court system, and then where it goes within that

11   system is not regulated by statute.

12      So doesn't that suggest that the court system as

13   a whole has jurisdiction over this, and then why don't we

14   treat the subsidiary question as a venue one?

15      MR. RAMKUMAR:  So I just want to make sure I'm

16   fully understanding your question.  Is your question that

17   because the Central District of California has subject

18   matter jurisdiction, that that conclusion should apply

19   throughout the Federal Court system?

20      JUDGE BIBAS:  That the District Courts as a whole

21   have subject matter jurisdiction when it arises from the

22   agreement.  We may have special rules when it comes to

23   contempt of court, but in general, why isn't -- why do you

24   resist your friend's suggestion that it's the District

25   Courts as a whole have subject matter jurisdiction, and

1    then however we chop that up is really a matter of venue.

2              MR. RAMKUMAR:  So the response to that is that

3    the judge in the Central District of California did not

4    exercise subject matter jurisdiction over the *Flores* case

5    based on the *Flores* Settlement Agreement.  The claims at

6    the outset of that case were facial allegations that

7    regulations were being violated and Federal constitutional

8    claims.  And then in Paragraph 35 of the FSA that was

9    subsequently entered, the District Court noted that it

10   explicitly retained jurisdiction while the case was pending

11   before it.

12             But because its jurisdiction was not founded

13   based on the *Flores* Settlement Agreement, the fact that

14   Judge Gee has subject matter jurisdiction does not provide

15   that the Court below has subject matter jurisdiction.  That

16   would be my --

17             JUDGE KRAUSE:  Why doesn't the agreement itself

18   give rise to Federal rights?  The Government has entered

19   into this agreement, and has committed as part of the

20   agreement that what it has in the agreement actually

21   supersedes INS policy.  Why isn't that -- does that become

22   as much a Federal question as the INS policy that's been

23   superseded and could have been challenged elsewhere?

24             MR. RAMKUMAR:  Again, I would just return back to

25   the fact that courts have generally embraced the principle

1  that subject matter jurisdiction cannot be created by

2  consent, irrespective of the principles and the terms of

3  the FSA.

4          And I would also note that the reading of

5  Paragraph 24(B) proposed by the other side is unnatural,

6  namely that jurisdiction refers to personal jurisdiction,

7  not subject matter jurisdiction.  They make that point in

8  their reply brief, I believe, for the first time --

9          JUDGE AMBRO:  But the last sentence of 24(B)

10  says, "In such an action, the United States District

11  Court," in this case outside the Central District of

12  California, "shall be limited to entering an order solely

13  to effect the individual claims of the minor bringing the

14  action."

15          One could argue from that that it's like, okay,

16  go wherever you want, and that court, you know, it's

17  limited as to what it can do, but it certainly can do that

18  with respect to the individual claims of the child.

19          MR. RAMKUMAR:  In response, Your Honor, I would

20  return back to the phrasing of Section 24(B), "Jurisdiction

21  and venue over the matter."  As the District Court found,

22  and as the Government presented in its brief, the most

23  natural reading of that phrase is that it refers to subject

24  matter jurisdiction because that is consistent with the

25  general principles that I've outlined just now, namely that

1   an independent basis for Federal question jurisdiction is
2   necessary in order for a claim to enforce the settlement
3   agreement to arise under Federal law.
4           JUDGE AMBRO:  Well, I mean the prior sentence
5   that you refer to, "May seek judicial review and the United
6   States District Court with jurisdiction and venue over the
7   matter to challenge that placement determination or to
8   allege noncompliance."
9           So in other words, if you're placed -- if you're
10  challenging your placement, and you're in Pennsylvania,
11  what's wrong with a Federal Court in Pennsylvania making a
12  determination as to whether that challenge can take place
13  or it's limited to in order to effect that particular
14  child, as I just quoted from the last sentence?
15          MR. RAMKUMAR:  The Government would submit that
16  an independent basis for Federal jurisdiction would be
17  needed in order for the entry of such an order.
18          I know that I've drastically exceeded my time
19  limit, but I would brief --
20          JUDGE AMBRO:  No, you're fine.
21          MR. RAMKUMAR:  But I would --
22          JUDGE BIBAS:  May I --
23          JUDGE AMBRO:  You're not out of time.
24          JUDGE BIBAS:  A question or two:  Your answer to
25  me about the precedent from our sister circuits that

1  suggested that there was no jurisdiction, you cited

2  *Munoz* and *Slaughter*, and your brief has a third one,

3  *Shaffer*.  I see that your friends in their reply brief say

4  that *Munoz* and *Shaffer* are both sovereign immunity cases.

5          And *Shaffer* has the additional wrinkle that it

6  was the Federal Circuit, the Tucker Act channeled this in a

7  way to the Court of Claims, so you perhaps rightly didn't

8  mention it at the lectern here.

9          And then *Slaughter* was an unpublished per curiam

10  decision where the District Court had reserved jurisdiction

11  to enforce decree violations only to itself.

12          So we don't have a sovereign immunity issue here,

13  we don't have a District Court that's reserving

14  jurisdiction to itself.  We have a District Court that's

15  entering a *Flores* Settlement that purports to say

16  jurisdiction is over here.

17          So why are those cases on all four with us?  You

18  asserted there would be a Circuit split, but I don't see

19  the Circuit split.

20          MR. RAMKUMAR:  So three responses on that point:

21          First, the Government's assertion of a Circuit

22  split was limited to the right to counsel claim

23  specifically, not this claim;

24          Second, the *Munoz* case, although it largely

25  concerned sovereign immunity, this is at 630 F.3d at 863,

1    the Ninth Circuit specifically notes that the result it

2    reached accords with the Supreme Court's decision in

3    *Kokkonen*, and specifically the principle that an

4    independent basis of jurisdiction from the Federal source

5    of the underlying claim is needed.

6         So in other words, the Ninth Circuit did a

7    sovereign immunity analysis, but then concluded that the

8    principles outlined and elucidated in *Kokkonen*.

9         JUDGE BIBAS: All right. There's a sovereign

10   immunity case with an aside at the end that favors you.

11   What else?

12        MR. RAMKUMAR: And then, again, the *Slaughter*

13   case out of the Eleventh Circuit, the Government would also

14   point to the *S.M.M.* case, citing *Munoz* to find that it

15   lacked jurisdiction over this very *Flores* Settlement

16   Agreement claim.

17        And finally I would also note that the only case

18   the other side appears to rely on is *W.S.R.* But

19   importantly, *W.S.R.* did not find jurisdiction based on the

20   reasoning that Appellants propose. Instead, *W.S.R.* found

21   jurisdiction primarily based on the fact that Judge Gee

22   initially had -- or the Central District of California

23   initially had jurisdiction when the *Flores* claims were

24   first brought.

25        And, again, as I've already explained, because

1  those claims were not predicated upon violations of the

2  *Flores* Settlement Agreement, that reasoning is erroneous

3  and inapposite.

4          And I briefly want to touch on the statutory

5  claim, and just kind of circle back to where we first

6  started.

7               So I mentioned at the outset that there --

8               JUDGE AMBRO:  Statutory claims what, to counsel,

9  or what?

10              MR. RAMKUMAR:  The statutory authorization of

11  MPP --

12              JUDGE AMBRO:  Okay, I got it.

13              MR. RAMKUMAR:  -- because, Judge Krause, as you

14  mentioned, the Government urged affirmance on alternative

15  grounds with respect to the second component; I want to

16  briefly touch on that, if I may.

17              JUDGE BIBAS:  On the merits, not on jurisdiction,

18  got it.

19              MR. RAMKUMAR:  Right.  Just -- and, again, to be

20  clear, just with respect to the second component of the

21  claim.

22              Now the Government's understanding is that the

23  second component is that Appellants concede that they were

24  properly placed full removal proceedings, but that

25  nonetheless MPP is not statutorily authorized as to them.

1          Now the Government would submit that affirmance

2    to alternative grounds is appropriate for two reasons:

3          First, that's a pure question of law, not

4    dependent on any further factual development;

5          And second, both parties briefed that issue below

6    and on appeal, so the Government submits that the issue is

7    squarely before this Court.

8          On the actual merits itself, the Government

9    submits the dispositive concession is on Page 20 of

10   Appellants' reply brief, which is that the contiguous

11   return authority adduced in Section 1225(b)(2)(C) can be

12   applied to applicants for admission inspected under Section

13   1225(b)(2).  It is uncontroverted that Appellants were

14   inspected for admission under Section 1225(b)(2), and that

15   settles that issue.

16         Now a moment ago, Appellants' counsel mentioned

17   the credible fear process.  That is a complete non

18   sequitur, and the reason is it is, again, undisputed that

19   none of the appellants in this case underwent the credible

20   fear process because none of them were placed in expedited

21   removal proceedings under Section 1225(b)(1).

22         Indeed, even *Jennings* made the point that

23   applicants placed in Section 1225(b)(1) are subject to an

24   initial determination.  The word "determination" is in the

25   statute in both Section 1225(b)(1) and Section 1225(b)(2),

1 and that antecedent determination, not any innate

2 characteristics of the alien, in large measure governs the

3 statutory authorization claim in this case.

4 So for those reasons, the Government would submit

5 that MPP is statutorily authorized.

6 If there are no further questions from the Court,

7 the Government is happy to rest on its papers.

8 Just one final point that I forgot:  As a

9 practical matter, moreover, the MPP guiding principles

10 provide that individuals placed in expedited removal and

11 found to have a credible fear will not have MPP applied to

12 them.  So as a practical matter, that scenario would not

13 occur.

14 JUDGE KRAUSE:  One quick question.  We had asked

15 counsel about the potential mootness issue, I gather the

16 Government's not suggesting that there's mootness to the

17 *Flores* claim given the injunction.

18 MR. RAMKUMAR:  No, Your Honor.  The Government's

19 understanding is that the provisions of the agreement

20 remain operative because the regulations promulgated were

21 enjoined.

22 JUDGE AMBRO:  Thank you very much.

23 Mr. DePrince?

24 JUDGE BIBAS:  Counsel, could I ask you to start

25 with the record?  Your friend on the other side made some

1    assertions about specifically what was and wasn't pled, and
2    directed us to joint appendix 319, 320, on the right to
3    counsel just being statutory and just being about removal
4    proceedings.  And I think he made some references to what
5    preserved at 321 and 322.
6            Do you agree or disagree with your friend's
7    characterization on the record?  And walk us through if you
8    have a different view where and why you have a different
9    view.
10           MR. DePRINCE:  Your Honor, I do disagree.
11           I think it would be disingenuous for us to state
12   that the termination of an attorney-client relationship
13   would not have an adverse impact on the overall removal
14   proceedings.
15           However, throughout the proceedings, we pled as
16   this would be a complete disruption of an attorney-client
17   relationship posing an independent legal harm, for example,
18   in the briefs at J.A. 73:  Sending Plaintiffs to Mexico, at
19   minimum, would be a substantial burden on the
20   relationships.  At worst, it would terminate the
21   relationship.
22           Plaintiffs are unable to obtain counsel in Mexico
23   to represent them in the U.S. removal proceedings.
24   American lawyers are unlikely to travel to Mexico to
25   represent them on a pro bono basis.  Similarly at the

1  preliminary injunction hearing.

2          J.A. 228:  Return to Mexico for this father and

3  his 6-year-old daughter would be an enormous obstacle for

4  the continued legal services provided by our offices and

5  advocates, and would likely lead to an impossible attorney-

6  client relationship between myself, this father, and his

7  child.

8          So our singular concession that perhaps to the

9  extent that this attorney-client relationship termination

10 would have an overall impact of the outcome of the removal

11 proceedings, we would concede that, it will.  But we do

12 allege an independent legal harm that is not channeled by

13 Subsection (b)(9).

14          And if I also may, Your Honor, if there's no

15 further questions about the right to counsel, I will

16 quickly clean that --

17          JUDGE BIBAS:  Just -- you did not make below this

18 argument about the ability to confer with a 6-year-old over

19 SIJS status, etc.  You're spelling it out in detail now,

20 but it's not something you mentioned below.

21          MR. DePRINCE:  That is correct, Your Honor.

22 That's just an example of the unpredictable and unfair

23 results that would stem from this kind of a holding as

24 supported by the District Court and the Government.

25          And then also, an individual is not -- going back

1   to the statutory authorization for MPP.  An individual is
2   not inspected and processed under (b)(2).  An individual is
3   inspected for admission into the United States, and based
4   on the determinations of that admissibility determination,
5   you either are (b)(1) or you are (b)(2), that is static.
6   And these individuals, it is uncontested they were
7   inadmissible based on one of the grounds expressly
8   enumerated at (b)(1), that being they had no documents and
9   were admissible under 1182(a)(7); the Government conceded
10  that at J.A. 355 of the preliminary injunction hearing.

11          And if I may also ask, if Your Honors would like
12  to hear my colleague speak about the issues raised in your
13  letter regarding *Flores v. Barr,* or are you fine that we
14  rest at this time?

15          JUDGE AMBRO:  Is there anything further you wish
16  to add, Mr. Wolff?

17          MR. WOLFF:  Briefly, Your Honor.  Based on the
18  Government's apparent concession that there's no mootness
19  issue, I'll take only a bit of time.

20          This goes to the question of merits.  This goes
21  to the question of whether the Government has discharged
22  its obligations under the agreement.  The District Court
23  found that the answer was no, issued an injunction.  The
24  Government has neither sought a stay of that injunction,
25  nor yet filed a notice of appeal in that case.

1          If the issue were to come up below, we would view

2     the Government is bound through issue preclusion by the

3     findings of the final judgment of the District Court in the

4     Central District on that issue.

5               JUDGE AMBRO:  Okay, thank you.

6               MR. WOLFF:  Thank you, Your Honor.

7               JUDGE AMBRO:  As I've done earlier today, if I

8     could ask counsel to get together and have a transcript

9     prepared of today's oral argument, and split the cost, if

10    you would.

11              I want to thank counsel, all of you, for being

12    here today.  It's an important issue, and very, very well-

13    presented.

14              Thank you.

15         (Whereupon, the proceedings concluded at 12:47 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2                    <u>CERTIFICATE OF TRANSCRIBER</u>

3

4        I, KAREN HARTMANN, a certified Electronic Court

5    Transcriber, certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8            I further certify that I am neither attorney nor

9    counsel for, not related to nor employed by any of the

10   parties to this action; and further, that I am not a

11   relative or employee of any attorney or counsel employed in

12   this action, nor am I financially interested in this case.

13

14   *Karen Hartmann*

15

16   Karen Hartmann, AAERT CET 475  Date:  November 15, 2019

17   TRANSCRIPTS PLUS, INC.

18

19

20

21

22

23

24

25